IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

RUDY B. ARCHULETA,

       Plaintiff,

v.                               CIV 09-291 JCH-GBW

MICHAEL J. ASTRUE,
Commissioner of Social Security,

       Defendant.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

This matter is before the Court on Plaintiff's Motion to Remand *(Doc. 20)* by reference from Judge Herrera to perform "any legal analysis required to recommend to the Court an ultimate disposition of the case." *Doc. 7.*[1] Having carefully considered the entire record and reviewed the parties arguments as well as the applicable law, I recommend that the motion be granted and the action remanded to the Commissioner to properly perform the phase II and III analyses of step 4.

### I.  Introduction

Plaintiff Rudy Archuleta began working for the "Developmentally Delayed Program" as a House Supervisor in January of 2003. *AR* at 57.  At that time, he was

---

[1] Judge Herrera originally referred this case to Magistrate Judge Martinez, but the case was later reassigned to the undersigned. *Doc. 12.*

thirty years old (*AR* at 49) and had work experience in jobs that ranged from cook to firefighter to construction laborer.  *AR* at 57.  In January of 2004, while working for the Developmentally Delayed Program, a disabled man under Claimant's care died, and Mr. Archuleta found him either dead or dying.  See *AR* at 20.  This incident was traumatic for Claimant, though he continued working for the Developmentally Delayed Program until May of 2005.  Claimant did seek medical treatment for anxiety on January 9, 2004, (*AR* at 151), July 2, 2004, (*AR* at 127), and July 9, 2004 (*AR* at 125).

Claimant's medical history was then quiet until July 8, 2005, when he visited the emergency room for an animal bite and panic attack.  *AR* at 107-09.  Later that month, on July 27, 2005, Claimant filed for disability benefits on account of anxiety, depression, and post-traumatic stress disorder.  *AR* at 15, 47.  He alleged an onset date of May 26, 2005, *AR* at 51-52, which is one day after he was fired by the Developmentally Delayed Program (*AR* at 277) for insubordination because he applied for a different job (*AR* at 136).[2]  Claimant testified that the separation from his job brought back "feelings of anxiety and panic."  *AR* at 267.

At least through August 15, 2007, the time of Claimant's hearing with the Administrative Law Judge (ALJ), Claimant partially managed his anxiety and panic

---

[2]Claimant is covered by insurance through December 31, 2009, and he therefore must establish that he was disabled before that date.  *AR* at 15.

attacks with medication (*see e.g. AR* at 21-23, 268) and calming techniques (*AR* at 18), and lived with a long-term girlfriend (*AR* at 18).  He worked part-time at the Animal Support Center (*AR* at 18), operated a paper route (*AR* at 18, 61), and cared for the 10 dogs, 8 cats, 1 rooster, and 3 ducks he keeps at home (*AR* at 18, 272).  The ALJ noted that although Claimant's part-time work did not constitute substantial gainful activity, she did take it as an indication of his ability to perform work-related activities.  *AR* at 17.

In her March 14, 2008, issued opinion, the ALJ found that Plaintiff had the residual functional capacity to perform work "at all exertional levels," but with certain non-exertional limitations.  *AR* at 19.  With the aid of testimony from a Vocational Expert (VE), the ALJ then identified one past relevant work position Claimant could still perform: Materials Handler.  *AR* at 26.  The ALJ thus denied benefits finding Claimant not disabled at Step 4.  *AR* at 26.  The Appeals Council declined review on March 10, 2009, thereby rendering the ALJ's decision final.  *AR* at 4.

In Plaintiff's Motion to Remand, Claimant asserts that the ALJ committed errors in her credibility analysis, evaluation of medical evidence, development of the record, and application of the step 4 legal standard.  *Doc. 20.*  If substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands, and Plaintiff is not entitled to relief.  *E.g., Grogan v. Barnhart*, 399 F.3d 1257, 1261-62 (10th Cir. 2005); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004);

*Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003).   "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Langley*, 373 F.3d at 1118 (internal quotations and citations omitted); *see also Hamlin*, 365 F.3d at 1214; *Doyal*, 331 F.3d at 760.  An ALJ's decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it."  *Langley*, 373 F.3d at 1118 (internal quotations and citations omitted); *see also Hamlin*, 365 F.3d at 1214.  My assessment is based on a "meticulous" review of the entire record, where I can neither re-weigh the evidence nor substitute my judgment for that of the agency.  *Hamlin*, 365 F.3d at 1214; see also *Langley*, 373 F.3d at 1118.

Of the several alleged errors, I find that the analytical errors in phase II and III of step 4 require a remand to the Commissioner for development of the record and proper application of the legal standard.

## II.  Analysis

*Credibility*:

First, Claimant asserts that the ALJ did not make a legally sufficient credibility determination.  *Doc. 20* at 19-20.  Specifically, Mr. Archuleta argues that the ALJ did not use the proper legal standard for determining Claimant's credibility.  *Id.* at 20.  This Court disagrees.

4

"Credibility determinations are peculiarly the province of the finder of fact, and [the Court] will not upset such determinations when supported by substantial evidence." *Kepler v. Chater,* 68 F.3d 387, 391 (10ᵗʰ Cir. 1995) (quotation omitted). Boilerplate language is insufficient. *E.g., id.; see also, e.g., Carpenter v. Astrue,* 537 F.3d 1264, 1266-70 (10ᵗʰ Cir. 2008); *Hardman v. Barnhart,* 362 F.3d 676, 679 (10ᵗʰ Cir. 2004). Instead, "findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Kepler v. Chater,* 68 F.3d 387, 391 (10ᵗʰ Cir. 1995) (internal quotation marks and brackets omitted). However, the Tenth Circuit does not "reduce[] credibility evaluations to formulaic expressions" and it "'does not require a formalistic factor-by-factor recitation of the evidence.  So long as the ALJ sets forth the specific evidence he relies on in evaluating the claimant's credibility, the dictates of *Kepler* are satisfied.'"  *White v. Barnhart,* 287 F.3d 903, 909 (10ᵗʰ Cir. 2001) (quoting *Qualls v. Apfel,* 206 F.3d 1368, 1372 (10ᵗʰ Cir. 2000)).

In the case at bar, the ALJ determined that Claimant's statements concerning the intensity, persistence, and limiting effects of Claimant's symptoms were "not entirely credible." *AR* at 20.  In making that determination, the ALJ discussed her reasoning at length: the discussion spans five pages of the Administrative Record.  *AR* at 20-24.  The ALJ sets forth several specific reasons for finding the claimant only partially credible, including:  (1) varying accounts in the record of exactly what happened during the

event that precipitated Mr. Archuleta's anxiety and panic attacks, *AR* at 20; (2) Mr. Archuleta telling Dr. White that he was unable to work since the death of his client, yet uncontroverted evidence shows that Claimant worked at that same job for 17 months after finding his client dead, *Id*.; (3) notes from one therapy session with Robert Ray which read: "Although [Mr. Archuleta] reports how traumatized he is this was not apparent to therapist in this session." *AR* at 21; (4) Claimant had several "no shows" for his therapy appointments, *AR* at 20; (5) Claimant did not consistently use his prescribed medications as directed, *AR* at 21; (6) Claimant chose to rely exclusively on a medication that he was told was not the first choice of treatment, could be addictive, and could only relieve symptoms once an attack started, not prevent them outright, *AR* at 22; (7) Although Claimant tried several SSRIs, a medication that can prevent the attacks, he never tried them for more than one week, *Id*.; and (8) Claimant discontinued use of the SSRIs because they made him shaky, restless, and nervous, which led the ALJ to the conclusion that the panic attacks themselves must not be as debilitating as Claimant alleged, since he'd rather live with the attacks than the side-effects of SSRIs, *AR* at 23-24.

This is clearly not a case of boilerplate language or a conclusion in the guise of findings.   There are five pages in the opinion devoted to discussion of specific evidence from the record that bears on Claimant's credibility.  Claimant rightly points out, however, that because some of the ALJ's reasons for discounting his credibility fall into

the category of "failure to treat," another rule is implicated:

> The regulations allow the agency to deny benefits to a claimant who does not follow prescribed treatment without a "good reason." 20 C.F.R. §§ 404.1530(b), 416.930(b). This court therefore long ago adopted a four-part test to assess a claimant's failure to pursue treatment: (1) whether treatment would have restored the claimant's ability to work; (2) whether treatment was prescribed; (3) whether treatment was refused; and (4) whether the excuse was justified. *See Frey v. Bowen*, 816 F.2d 508, 517 (10th Cir.1987).  Inability to pay for treatment may justify failure to pursue treatment. *See Thompson v. Sullivan*, 987 F.2d 1482, 1489-90 (10th Cir.1993); *Baker*, 886 F.2d at 292.

*Norris v. Apfel*  215 F.3d 1337, 2000 WL 504882, 8 (10th Cir. 2000).

Reasons 4-7, above, implicate the failure to treat rule.  The ALJ noted in her opinion that Dr. White instructed Mr. Archuleta that SSRIs, unlike the Xanax he used, could actually prevent panic attacks.  *AR* at 23.  As panic attacks are the foundational reason Mr. Archuleta claims he is unable to work, treatment with SSRIs, if sufficiently tolerated, could restore Claimaint's ability to work.  The ALJ also noted that SSRIs and proper use of Xanax, along with therapy, were prescribed.  *AR* at 21; 268-69.  Claimant, however, refused to take his medicine as described.  *AR* at 21-23 (giving a detailed account of Claimant's departures from prescribed medicine use).  Finally, Claimant gave the ALJ no justifiable excuse for his departures from prescribed treatments.  In fact, When the ALJ asked Plaintiff about all of his "no shows" for his therapy appointments, Plaintiff responded that although there were some he could not get to because of transportation, he missed most of them simply because he forgot.  *AR* at

282.[3]

The ALJ did not state she that she was employing the rule for "failure to treat" considerations, and she did not explicitly discuss each of the rule's factors for each of the failure to treat reasons she mentioned in her opinion.  Nonetheless, the ALJ's credibility discussion demonstrates that she did analyze the facts under the appropriate rule.  Moreover, credibility evaluations do "not require a formalistic factor-by-factor recitation of the evidence."  *White*, 287 F.3d at 909 (quoting *Qualls*, 206 F.3d at 1372).  "Credibility determinations are peculiarly the province of the finder of fact, " *Kepler*, 68 F.3d at 391 (quotation omitted), and substantial evidence supports the ALJ's conclusion in this case.  Thus, this Court affirms the ALJ's credibility finding.

***Evaluation of the Medical Evidence:***

---

[3]Claimant points out that the Sixth Circuit and District Courts within the 10th Circuit have found that those with mental impairments may not recognize the importance of consistent treatment.  See e.g. *Blankenship v. Bowen*  874 F.2d 1116, 1124 (6th Cir. 1989)("Appellant may have failed to seek psychiatric treatment for his mental condition, but it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation.").  *See also Kratochvil v. Barnhart* 2003 WL 22176084, 5 (D.Kan. 2003)("The record includes evidence that Plaintiff was in denial or struggling to accept her mental disability. That alone might explain why she did not seek treatment. *See Caldwell v. Sullivan*, 736 F.Supp. 1076, 1082 (D.Kan. 1990) (absence of notation of mental difficulties in physician's notes does not alone support finding of no impairment, for those suffering from mental difficulties may be unable to recognize the need for treatment)).  Even if this Court were to adopt the position of the Sixth Circuit, that reasoning would not undermine the ALJ's finding so dramatically as to bring them below the substantial evidence threshold.

Next, Claimant argues that the ALJ improperly weighed the medical evidence.
*Doc. 20* at 5.  Specifically, he asserts that the ALJ failed to give adequate weight to the
Consultative Evaluation of Dr. Gzaskow and to Dr. White's Mental Impairment
Questionnaire and October 2, 2006 progress note.  *Id.*  Because this Court finds no error,
it affirms the ALJ's evaluation and weighing of the medical evidence.

Dr. Gzaskow's Opinion:

Claimant argues that the opinion of Dr. Gzaskow, the administration's
Consulting Examiner, should have been given more than "limited" weight, and that the
reasons the ALJ gave for discounting the opinion were contrary to law.  *Doc. 20* at 6-7.

To begin, Dr. Gzaskow is a Board-Certified Psychiatrist, *AR* at 140, and as such
he is an acceptable medical source capable of giving a medical opinion.  20 C.F.R. §§
1513(a)(1).  A "medical opinion" is a term of art; "[m]edical opinions are statements
from physicians and psychologists or other acceptable medical sources that reflect
judgments about the nature and severity of your impairment(s), including your
symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and
your physical or mental restrictions."  20 C.F.R. § 404.1527(a)(2).  Because the evaluation
includes "judgments about the nature and severity of Claimant's impairments,
including his symptoms, diagnosis and prognosis, restrictions and capabilities," it is a
medical opinion.  *See esp.* AR at 139-40.

Based upon 20 C.F.R. § 404.1527(d), the Tenth Circuit has laid out the six factors

an ALJ must consider when evaluating a non-treating doctor's medical opinion[4] as

follows:

> (1) the length of the treatment relationship and the frequency of
> examination; (2) the nature and extent of the treatment relationship,
> including the treatment provided and the kind of examination or testing
> performed; (3) the degree to which the physician's opinion is supported
> by relevant evidence; (4) consistency between the opinion and the record
> as a whole; (5) whether or not the physician is a specialist in the area upon
> which an opinion is rendered; and (6) other factors brought to the ALJ's
> attention which tend to support or contradict the opinion.

*Watkins v. Barnhart* 350 F.3d 1297, 1301 (10th Cir. 2003)(citing *Drapeau v. Massanari*, 255

F.3d 1211, 1213 (10th Cir. 2001)(quotation omitted)); *see also* 20 C.F.R. § 404.1527(d);

*Hamlin v. Barnhart* 365 F.3d 1208, 1215 (10th Cir. 2004); *Lauxman v. Astrue* 321 F. App'x

766, 769 (10th Cir. 2009). The ALJ is not required, however, to explicitly discuss all the

factors in her opinion. *Oldham v. Astrue* 509 F.3d 1254, 1258 (10th Cir. 2007).

The ALJ stated that she accorded only limited weight to Dr. Grazkow's opinion.

*AR* at 25. She then discussed her consideration of the §404.1527(d) factors. She noted

---

[4] When the ALJ is discounting the weight she accords a *treating* physician's
opinion, she also has a duty to be "sufficiently specific to make clear to any subsequent
reviewers the weight the adjudicator gave to the treating source's medical opinion and
the reasons for that weight." *Oldham,* 509 F.3d at 1258 (quoting *Watkins v. Barnhart* 350
F.3d 1297, 1300 (10th Cir. 2003). Because Dr. Gzaskow provided no medical treatment to
the Claimant, he had no treatment relationship with the Claimant that may have
entitled his opinion to controlling weight. 20 C.F.R. § 404.1527(d).

that there was an examining relationship, but it was limited because there had been only one examination. *Id.* She also noted that Dr. Grazkow is a consultative psychiatric examiner. *Id.* As such, he did not evaluate Claimant for treatment purposes. The ALJ also found the explanation Dr. Grazkow gave for his opinion "wanting." *Id.*; *see* 20 C.F.R. § 404.1527(d)(3)(". . . . The better an explanation a source provides for an opinion, the more weight we will give that opinion.") Additionally, the ALJ found the opinion inconsistent with the record as a whole. *AR* at 25. She noted how Dr. Gzaskow recounted a different version of events for the night of the death of Claimant's client than those recounted elsewhere in the record, and she noted that he diagnosed Claimant with a disorder with which no other medical source (treating or not) had ever diagnosed him. *Id.* The ALJ did not explicitly discuss Dr. Gzaskow's specialty, but she acknowledged it when she stated he was a psychiatric examiner with an M.D. *Id.* Finally, she also discussed a few "other" factors that influenced her decision: (i) the doctor "generally accepts subjective reports of symptoms as the truth"; in what should be the doctor's conclusions section of the opinion, for one of his points the examiner merely penned "He [Claimant] states he can not [sic] withstand the stress and pressures of day-to-day work activity, currently, and is asking for interim help until he can . . . 'get back on my feet,'"*AR* at 25, 140; (ii) the doctor's "observations on mental status examination don't reflect the severity of impairment he assessed," *AR* at 25; and (iii) the

11

opinion was internally inconsistent, stating at one point that Claimant did not drink alcohol and at another point that he "has mild drinks of alcohol." *Id*. The ALJ then found the internal inconsistency to be indicative of the general "wanting" characteristic of the opinion as a whole. *Id*.

It is clear from the ALJ's discussion of the examiner's opinion that she considered the §404.1527(d) factors. Because Dr. Gzaskow was not a treating physician, a reasoned consideration of the factors was all that was required prior to assigning his opinion "limited weight." The ALJ, however, met even the heightened standard required when discounting treating physicians' opinions. She stated succinctly what weight she assigned to the examiner's opinion, *AR* at 25, and her subsequent discussion made "clear to any subsequent reviewers . . . the reasons for that weight." *Oldham*, 509 F.3d at 1258 (quoting *Watkins v. Barnhart* 350 F.3d 1297, 1300 (10th Cir. 2003)). Thus, she committed no error when she accorded the Consultative Examiner's opinion limited weight.

Plaintiff argues that the ALJ failed to use the appropriate legal standard because she based her decision to accord limited weight, in part, on the fact that the examiner only saw Claimant once. *Doc. 20* at 6. To the contrary, Tenth Circuit precedent permits, indeed *requires,* that "frequency of examination" be considered when deciding the weight to accord medical opinions. *Drapeau v. Massanari* 255 F.3d 1211, 1213 (10th Cir.

2001)(quoting *Goatcher v. United States Dep't of Health & Human Servs.*, 52 F.3d 288, 290

(10th Cir.1995)).

Plaintiff also contends that the ALJ erred when she discounted the examiner's

opinion, in part, because the examiner accepted Claimant's reporting of subjective

symptoms as true. *Doc. 20* at 7. The law Plaintiff cites does not support his proposition

that such a consideration is error. Moreover, the ALJ did not discount the opinion just

because the examiner accepted the reported symptoms as true, but because the

evaluation lacked a critical piece of the examination process: that part where the

examiner filters the reported symptoms through the examiner's own observations,

experience, and any other evidence he may have, in order to give his own opinion as to

the limitations and capabilities of the Claimant. Without that piece of the process, the

"evaluation" is merely a self-report through the pen of a third-party note-taker, and that

is clearly not what the regulations envision for medical opinions.

Finally, Plaintiff also suggests that remand is required because, in "violation of

the regulations," Dr. Gzaskow did not have Plaintiff's medical records prior to

evaluating Plaintiff. *Doc. 20* at 5.[5] In support of this contention, Claimant cites *McKenna*

---

[5] Notably, this argument significantly undermines Claimant's argument that the examiner's opinion should have been accorded greater weight. Common sense dictates that one would accord lesser weight to a doctor's opinion if that doctor did not review a patient's records prior to the consultation.

*v. Chater*, 893 F.Supp. 163 (E.D.N.Y. 1995). *McKenna*, however, does not stand for such a broad proposition. In *McKenna*, the ALJ relied upon the Consultative Examiners's opinion despite the fact that the examiner did not indicate whether he received or reviewed the plaintiff's medical records, and his opinion was contrary to other physicians that had evaluated plaintiff more thoroughly and frequently, including the plaintiff's treating physician. *Id.* In remanding the case, the Court found that the ALJ abused his discretion in failing to subpoena the examiner so that the plaintiff could cross-examine him. *Id.* at 170.

The case at bar is distinguishable. Here, the Consultative Examiner, like the examiner in *McKenna*, did not review Plaintiff's past medical records. The ALJ in this case, unlike the ALJ in *McKenna*, however, did not rely upon the examiner's opinion. Moreover, when the ALJ asked Plaintiff's attorney at the beginning of the hearing about evidence to be included in the record, Plaintiff neither objected to the inclusion of the examiner's opinion as an exhibit, nor suggested that anything was missing *AR* at 259. Generally, the ALJ is entitled to rely upon Plaintiff's counsel to identify any "issues requiring further development." *See Branum v. Barnhart*, 385 F.3d 1268, 1271 (10th Cir. 2004).

Claimant has thus pointed to no legitimate reason to disturb the finding of the ALJ. This Court finds that the ALJ applied the correct legal standard and was within

14

her discretion when she assigned limited weight to the examiner's opinion.

Dr. White:

*Was Dr. White a "Treating Physician" When She Wrote Her May 3, 2006 Opinion?*

Next, Claimant contends that the ALJ erred when she accorded Dr. White's May 3, 2006 Mental Impairment Questionnaire (*AR* at 201) "little weight beyond her diagnosis." *AR* at 24.  The parties appear to agree that the questionnaire constitutes a medical opinion, but disagree as to whether or at what point Dr. White became a treating physician.  The Court, however, need not decide whether Dr. White was a treating physician at the time of her May 3, 2006 questionnaire because, as discussed below, the ALJ followed the proper procedure for discounting the opinion even if Dr. White is properly considered a treating physician.

*Did the ALJ Sufficiently Document Good, Specific Reasons for Discounting Dr. White's May 3, 2006 Opinion?*

As discussed in the section on Dr. Gzaskow's evaluation, the ALJ must consider the factors listed under  20 C.F.R. § 404.1527(d) to decide what weight to give medical opinions.  *See e.g. Hamlin v. Barnhart*  365 F.3d 1208, 1215 (10th Cir. 2004); *Lauxman v. Astrue*  321 F. App'x 766, 769 (10th Cir. 2009).  The ALJ is not required, however, to explicitly discuss all the factors in her opinion.  *Oldham v. Astrue*  509 F.3d 1254, 1258 (10th Cir. 2007).  When the ALJ is discounting the weight she accords treating physician's opinion, she also has a duty to be "sufficiently specific to make clear to any

15

subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Oldham*, 509 F.3d at 1258 (quoting *Watkins v. Barnhart* 350 F.3d 1297, 1300 (10th Cir. 2003).  "In all cases, the regulations require that the ALJ 'give good reasons' in the notice of determination or opinion for the weight that is given the treating physician's opinion." *Doyal v. Barnhart*, 331 F.3d 758, 762 (10th Cir. 2003)(quotations omitted).  Because the ALJ gave good, specific reasons for discounting the weight she accorded to Dr. White's May 3, 2006 opinion, this Court finds that she did not err by assigning the opinion "little weight."  *AR* at 24.

First, the ALJ properly considered the length of the treatment relationship and frequency of examination.  *AR* at 24.  Even if the scant treatment record prior to May 3, 2006 does not render Dr. White a nontreating physician as suggested by the ALJ, it certainly is a factor that cuts against crediting Dr. White's opinion great weight.  *See* 20 C.F.R. § 404.1527(d)(2)(i)("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.").

Second, the ALJ considered the "nature and extent of the treatment relationship," 20 C.F.R. § 404.1527(d)(2)(ii), and found it wanting.  The code specifies that "Generally, the more knowledge a treating source has about your impairment(s), the more weight we will give to the source's medical opinion."  20 C.F.R. § 404.1527(d)(2)(ii).  The ALJ

16

gave little weight to Dr. White's May 2006 opinion in part because, unlike other health care providers, Dr. White never witnessed one of Claimant's panic attacks.  *AR* at 24-25. Thus, when Dr. White wrote: "panic attacks 2-4/day, nightmares, sleep disturbances," in response to the Questionnaire's call to "Describe the *clinical findings* including results of mental status examination which demonstrate the severity of your patient's mental impairment and symptoms," (*AR* at 202, emphasis in original) she was merely reiterating Claimant's self-reported symptoms.  *AR* at 24-25.

It was especially troubling to the ALJ that Dr. White's opinion was based on Plaintiff's subjective complaints because the record was devoid of objective evidence of Plaintiff's symptoms to the extent he alleged their severity.  For example, when Plaintiff went to the emergency room at Alta Vista on July 8, 2005,[6] he reported heart pounding, sweaty hands and dizziness since the day before.  *AR* at 108.  However, as the ALJ noted, the emergency care physician "observed no autonomic signs of an 'anxiety attack' or panic attack" *AR* at 24 n.2, 111.  The emergency room record reveals Plaintiff reported that he was having an anxiety attack, yet his heart rate was 72 beats per minute, respiratory rate was 20 breaths per minute, appearance was without acute distress, breathing sounds were normal, and skin was warm, dry and of normal color.

_____

[6]The ALJ referred to this visit as happening July 5, 2005, *AR* at 24 n.2; but, in fact, the visit to which she referred occurred on July 8, 2005.  See *AR* at 111.

17

*AR* at 24, 109-11.  A normal adult heart rate is between 60 to 100 beats per minute, and a normal adult respiratory rate is between 14 to 20 breaths per minute.[7]  In addition, as the ALJ noted, Plaintiff was alert, oriented, cooperative and not agitated.  *AR* at 109, 111.  It is acceptable for the ALJ to consider the tendency of some claimants to exaggerate symptoms to obtain benefits.  *See Frey v. Bowen* 816 F.2d 508, 517 (10th Cir. 1987).

Next, the ALJ appropriately pointed to the opinion's inconsistency with the record as a whole as a reason for according it little weight.  *See AR* at 24; 20 C.F.R. § 404.1527(d)(4).  First, the ALJ stated that she could not adopt Dr. White's May 2006 opinion that Plaintiff had a marked impairment in his ability to maintain attention and concentration for extended periods (*AR* at 24, 201-2) because Dr. White's opinion was inconsistent with her own clinic notes.  *AR* at 24.  Significantly, the ALJ observed that Dr. White's notes from her first meeting with Plaintiff on September 7, 2005 showed that Plaintiff's short and long-term memory were within normal limits, and he had no dysfunction with his attention and concentration.  *AR* at 24, 168.  Indeed, the only negative mental status finding documented in the written evaluation for the September 2005 meeting was that Claimant's mood was "moderate[ly]" anxious.  *AR* at 168.  In her Mental Impairment Questionnaire dated May 3, 2006, however, Dr. White opined that

---

[7]*See* http://medinfo.ufl.edu/year1/bcs/clist/vitals.html.

18

Plaintiff had a marked impairment in his ability to maintain attention and concentration for extended periods.[8]  *AR* at 202.  Furthermore, the record also shows that Plaintiff admitted in his Function Report that his mental conditions did not affect his memory and concentration.  *AR* at 81.

The ALJ also stated that Dr. White's opinion that Plaintiff had a marked impairment in his ability to perform activities within a schedule, be punctual, and maintain regular attendance was inconsistent with the undisputed fact that Plaintiff maintained a daily newspaper delivery route continuously from January 2004 throughout the relevant period.  *AR* at 24; *see also AR* at 52, 70, 76, 261.  Plaintiff argues that Dr. White's finding of marked impairment in punctuality is not inconsistent with the record because the route is not substantial gainful activity and Plaintiff's sister helps him with his route.  *Doc. 25* at 1-2.

First, the entire record, which includes evidence of Claimant's activities–gainful or otherwise, is supposed to be considered when determining a claimant's eligibility for disability benefits.  *Ray v. Bowen,* 865 F.2d 222, 226 (10th Cir. 1989).  So, the route's status as not substantial gainful activity does not make it improper to consider on this issue.

_____

[8]The ALJ also stated that some of Dr. White's clinic notes indicated that Claimant had no dysfunction in attention, concentration or memory, contrary to Dr. White's findings in the May 3, 2006 questionnaire.  The ALJ cites the record at Exh. 10F at 15, but that page is a "Clinic Medication Record" (*AR* at 219), and it does not support the ALJ's contention.

Second, while that Plaintiff did testify that his sister "accompanied" him on his route

because he feels safer having someone with him in case he has an attack, there is no

evidence that she does so to ameliorate his problems with keeping a schedule. *AR* at

272. Moreover, it is not an unreasonable conclusion that the keeping of a paper route

for several years, with or without accompaniment, is at least partially at odds with a

finding of a marked impairment in punctuality, keeping a schedule, and regular

attendance. Since in the course of this review, I may "neither reweigh the evidence nor

substitute [my] judgment for that of the agency," *Casias v. Sec'y of Health & Human*

*Servs.*, 933 F.2d 799, 800 (10th Cir.1991), I find that Claimant's paper route was one of

several valid reasons for the ALJ to discount Dr. White's opinion.

Finally, some of Dr. White's May 3, 2006 conclusions may have been drawn from

false information. Contrary to the information in Dr. White's September 7, 2005

evaluation notes (see *AR* at 166), on which she must have relied for her May 3, 2006

Questionnaire, there was nothing in the record that showed Plaintiff was terminated

from any job for any medical condition. As the ALJ noted, Plaintiff was fired from his

last full-time job as a house care-giver for insubordination after his employer

discovered he had applied for work with another Las Vegas agency. *AR* at 24, 136; *see*

*also AR* at 267 (Claimant testifying that he was let go from his last employer due to a

disagreement with his boss).

Accordingly, the ALJ properly weighed and gave good, specific reasons for discounting Dr. White's May 3, 2006 opinion.  This Court finds no error.

*Is Dr. White's October 2, 2006 Progress Note a "Medical Opinion" That the ALJ Needed to Address in Her Opinion?*

Next, Claimant appears to argue that Dr. White's October 2, 2006 progress note (*AR* at 211) is a medical opinion, and as such, it needed to be addressed by the ALJ in her opinion.  *Doc. 20* at 9, *Doc. 25* at 1.

A "medical opinion" is a term of art.  "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 404.1527(a)(2).  Certain issues, such as whether a Claimant is able to work, however, are reserved to the Commissioner.  20 C.F.R. § 404.1527(e).  In a case with similar facts, the Tenth Circuit has interpreted §404.1527(a)(2) and (e) as follows:

> Mr. Cowan argues that the ALJ did not give specific and legitimate reasons for not giving Dr. Gietzen's medical opinion controlling weight. On an insurance form dated September 30, 2003, Dr. Gietzen wrote in the space labeled "PROGNOSIS/REMARKS": "[Mr. Cowan] had a stroke and I feel he may never return to work." *Id.* at 106. . . . Dr. Gietzen's brief statement on the medical form was not a true medical opinion.  It did not contain Dr. Gietzen's judgment about the nature and severity of Mr. Cowan's physical limitations, or any information about what activities Mr. Cowan could still perform.  *See* 20 C.F.R. § 404.1527(a)(2).  It merely stated

that the doctor did not know if Mr. Cowan would be able to return to
work, which is an issue reserved to the Commissioner. *Id.* §404.1527(e).

*Cowan v. Astrue*, 552 F.3d 1182, 1188 -1189 (10th Cir. 2008).

In the "Assessment" field of the October 2, 2006 progress note, Dr. White wrote:

"Panic attacks continue and interfere with client's ability to seek full-time

employment." *AR* at 211.  No other portion of the note contained the doctor's

judgments about the nature and severity of Claimant's limitations, nor was there any

information about what activities Claimant could still perform.  To what degree a

claimant has the ability to seek full-time employment is a vocational finding reserved to

the Commissioner.  20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1); SSR 96-5p.  Thus, the ALJ

did not err by treating the October 2, 2006 progress note as medical evidence that does

not rise to the status of a "medical opinion."

Of course, all relevant medical evidence, regardless of its status, must be

considered by the ALJ.  *Flores v. Apfel*  2000 WL 1694301, 2 (10th Cir. 2000); *Baker v.*

*Bowen*, 886 F.2d 289, 291 (10th Cir.1989).  Opinions on vocational issues also must not be

disregarded, but "even when offered by a treating source, they can never be entitled to

controlling weight or given special significance."  SSR 96-5P, 1996 WL 374183, 2.  Here,

there is no evidence that the ALJ improperly disregarded the October 2, 2006 progress

note.  Even Dr. White's statement as to Claimant's (in)ability to seek work is consistent

with the ALJ's RFC assessment.  An impairment can interfere with a claimant's ability

to seek employment and not be disabling.  In fact, the regulations define disability as the "inability" to do any work, not as merely having an impairment that interferes with a claimant's ability to seek or perform work.  *See* 20 C.F.R. §§ 404.1505(a), 416.905(a). Overall, the ALJ properly considered Plaintiff's anxiety-related disorder and found that it significantly limited Plaintiff's ability to perform a full range of work.  *AR* at 18-19. Because Dr. White's October 2006 progress note is not a medical opinion, and, in any event, does not conflict with the ALJ's RFC findings, I dismiss Plaintiff's argument that the ALJ did not properly weigh Dr. White's October 2, 2006 progress note.

*Phase II, Step 4 Duty to Develop the Record and Make Specific Findings:*

Next, Claimant asserts that the ALJ failed to apply the appropriate legal standard in her step 4 analysis.  Specifically, he argues that the ALJ 1) failed to account for certain evidence in her phase I analysis; 2) failed to develop the record regarding Claimant's Past Relevant Work (PRW) position of "Materials Handler;" 3) inappropriately assigned her responsibility for findings related to Claimant's PRW to the Vocational Expert (VE); and 4) failed to state in her opinion the demands of the Materials Handler position.  *See Doc. 20* at 12, 16-18.  For the reasons outlined below, this Court agrees that the ALJ erred on points 2-4, above, and remands on the limited issue of the phase II, step 4 analysis.

Claimant first contends that the ALJ failed to include in her phase I RFC finding any limitations that reflected evidence in the record that Claimant "has difficulty

leaving his house alone, because he is in constant fear of having a panic attack," that he has difficulty relating to others, or that the Consultative Examiner opined that Claimant would need a structured environment in order to work. *Doc. 20* at 16. This Court disagrees.

In the step 4 analysis, the ALJ must make a finding of the Claimant's Residual Functional Capacity (RFC). *Henrie v. U.S. Dept. Of Health & Human Services*, 13 F.3d 359, 361 (10th Cir. 1993). It is true that there are several instances in the record where Mr. Archuleta claimed or complained to others that he was nervous about leaving the house because he was afraid of having panic attacks while out and about. *See e.g. AR* at 79, 202, and 270. For reasons explained earlier in this opinion, however, it is also true that the ALJ legitimately found that Claimant exaggerated his symptoms. She was within her right to discount Claimant's credibility, and her RFC reflects her credibility finding. Likewise, as discussed above, the ALJ legitimately discounted the opinion of the Consultative Examiner, and it follows that her RFC finding would reflect her decision to accord the examiner's opinion little weight. As to Claimant's contention that the RFC does not reflect Claimant's difficulty relating to others, the Court disagrees and notes that the RFC finding specifically states, "he can understand, remember and execute simple instructions and tasks in work *requiring no more than minimal collaboration with coworkers and supervisors and no contact with the public*." *AR* at 19, Court's emphasis.

Accordingly, the Court finds no error in phase I of the ALJ's step 4 analysis.

Claimant's alleged errors as to phase II of the step 4 analysis require a more in-depth discussion.  Social Security Regulation 82-62 outlines the duties of an ALJ when evaluating a claimant's PRW for purposes of the step 4 analysis. It states that the ALJ has a duty to make "every effort" to "secure evidence that resolves the issue [of whether a claimant has the RFC to perform PRW] as clearly and explicitly as circumstances permit." SSR 82-62; 1982 WL 31386, 3.  The regulation goes on to identify a long list of information about a claimant's PRW that must be gathered, and it puts an even more onerous duty on the ALJ to develop the record where the claim involves a mental or emotional impairment.  *Id.*  Finally, the regulation requires that the opinion include three specific findings of fact: "1. A finding of fact as to the individual's RFC; 2. A finding of fact as to the physical and mental demands of the past job/occupation; and 3. A finding of fact that the individual's RFC would permit a return to his or her past job or occupation."  *Id.* at 4.

The Tenth Circuit adopted the mandates of SSR 82-62 in *Henrie v. U.S. Dept. Of Health & Human Services*, 13 F.3d 359, 361 (10th Cir. 1993); and, with more gusto, in *Winfrey v. Chater*, 92 F.3d 1017, 1023-25 (10th Cir. 1996).  In pertinent part, the *Winfrey* Court held as follows:

> ["]When the claimant has a mental impairment,care must be taken to
> obtain a precise description of the particular job duties which are likely to

25

produce tension and anxiety, e.g., speed, precision, complexity of tasks, independent judgments, working with other people, etc., in order to determine if the claimant's mental impairment is compatible with the performance of such work.["]  *Id.* [SSR 82-62] Here, the ALJ made no inquiry into, or any findings specifying, the mental demands of plaintiff's past relevant work, either as plaintiff actually performed the work or as it is customarily performed in the national economy.

On appeal, the Secretary argues, relying on cases from outside this circuit, that plaintiff bore the responsibility for developing the record as to the demands of his past relevant work. Tenth Circuit law concerning the ALJ's duty of inquiry and factual development is, however, to the contrary. *See, e.g., Washington*, 37 F.3d at 1442; *Henrie*, 13 F.3d at 361. Further, the Secretary's own rule dictates that the ALJ make the necessary findings at phases two and three of the step four inquiry. *See* SSR 82-62, Soc. Sec. Rep. Serv., Rulings 1975-1982, at 813.

. . . . Having failed to complete phase two appropriately, the ALJ was unable to make the necessary findings at phase three about plaintiff's ability to meet the mental demands of his past relevant work despite his mental impairments. The Secretary glosses over the absence of the required ALJ findings, by relying on the testimony of the VE that plaintiff could meet the mental demands of his past relevant work, given the mental limitations found by the ALJ. This practice of delegating to a VE many of the ALJ's fact finding responsibilities at step four appears to be of increasing prevalence and is to be discouraged.

. . . . Requiring the ALJ to make specific findings on the record at each phase of the step four analysis provides for meaningful judicial review. When, as here, the ALJ makes findings only about the claimant's limitations, and the remainder of the step four assessment takes place in the VE's head, we are left with nothing to review.

. . . . Therefore, while the ALJ may rely on information supplied by the VE at step four, the ALJ himself must make the required findings on the record, including his own evaluation of the claimant's ability to perform his past relevant work.

*Winfrey*, 92 F.3d at 1024-25 (10th Cir. 1996)(quotation marks omitted).[9]

The ALJ failed to satisfy these requirements in her phase II analysis.  First, she failed to develop the record as to what the physical and mental demands are for a "Materials Handler."  There is virtually no evidence in the record regarding this position.  In his Disability Report, Claimant lists a "labor" job that he held from 1993-94 on a construction site.  *AR* at 52.  That position may or may not have been the Materials Handler position to which the ALJ and VE refer.[10]  Even assuming it is, the only information Claimant provided about the job is his rate of pay and weekly hours.  *Id.* Where he was supposed to explain the specific demands of that job, he simply left the

_____

[9]At least two unpublished Tenth Circuit decisions suggest that the apparent demands of *Winfrey* and SSR 82-62 might be somewhat relaxed.  *See e.g. Westbrook v. Massanari*, 26 Fed App'x 897, 903 (10th Cir. 2002)("Our holding in *Winfrey*, however, is not designed to needlessly constrain ALJs by setting up numerous procedural hurdles that block the ultimate goal of determining disability"); *see also Hagar v. Barnhart*, 102 Fed App'x 146 (10th Cir. 2004), affirming *Hagar v. SSA*, CIV 02-1258 (D. New Mexico)(affirming an ALJ's finding of no disability where the ALJ made "some effort" to develop the record but  failed to make a finding as to the PRW's demands).  Neither of those cases, however, involved an ALJ's finding of a severe mental impairment, as does the case at bar.  Moreover, *Winfrey*'s impact on the legal standard for the 4th step analysis has been profound.  Its scope has been only slightly narrowed by distinguishing cases, and hundreds of opinions have cited *Winfrey* as authority for the step 4 legal standard.  *See e.g. Alexander v. Barnhart*, 88 Fed App'x 302 (10th Cir. 2004); *Norris v. Apfel*, 215 F.3d 1337 (10th Cir. 2000); *Young v. Apfel*, 198 F.3d 260 (Table), 1999 WL 979240 (10th Cir. 1999).

[10]The VE states that Materials Handler is a labor position, and he notes that Claimant has had two labor positions.  *AR* at 283.  It is not clear on what information the VE relied for Claimant's work history, as the Work History Report only lists one "Labor" job and never refers to a Materials Handler.  *See AR* at 57.

page blank. *AR* at 60. The next time the position appears in the record is during the VE's testimony regarding which jobs he believed a person with Claimant's RFC could perform. *AR* at 283-86. The only additional information that testimony revealed, however, is that the Materials Handler position is DOT 408.687-014, semi-skilled, SVP 3, of a heavy exertional level, and "would only have incidental contact [with other people]." *Id.* This thin factual development is not enough to meet the requirements of *Winfrey* and SSR 82-62. The ALJ should have developed the record as to the mental demands of the Materials Handler position. Her failure to do so was error.

The ALJ also erred when she failed to state her phase II findings, and her reliance on VE testimony does not correct that error. The part of the ALJ's opinion that touches on the phase II and III analyses reads simply:

> Claimant is capable of performing past relevant work as a materials handler. The vocational expert testified that this work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965). In comparing Claimant's residual functional capacity with the physical and mental demands of this work, the undersigned finds that the claimant is able to perform it as actually and generally performed.

*AR* at 26.

There is no "finding of fact as to the physical and mental demands of the past job/occupation." SSR 82-62. This failure is unsurprising given the scant record about the past job. Consequently, the ALJ's analysis at phase III is also in error: "Having

failed to complete phase two appropriately, the ALJ [is] unable to make the necessary findings at phase three." *Winfrey*, 92 F.3d at 1024-25.  Finally, the ALJ's reliance on VE testimony, by itself, cannot salvage her phase II and III analyses:

> It is improper for an ALJ to make RFC findings and then to delegate the remaining phases of the step four analysis to the vocational expert, because in such cases, "the remainder of the step four assessment takes place in the VE's head" and "we are left with nothing to review."

*Doyal v. Barnhart*  331 F.3d 758, 761 (10th Cir. 2003)(citing *Winfrey*, 92 F.3d at 1025).  Here, phase II and III occurred inside the VE's head instead of the ALJ's opinion, and this Court is left with nothing to review.  Therefore, this Court remands for development of the record and proper application of the step 4 legal standard.

Claimant also alleges another error in the ALJ's analysis of the third phase of step 4 (*Doc. 20* at 18-19) and takes issue with the ALJ's hypothetical to the VE (*Doc. 20* at 14-15).  Because the phase II and III errors at step 4 herein discussed are dispositive of remand, however, this Court need not and does not reach those arguments.

Wherefore,

**IT IS HEREBY RECOMMENDED THAT** Claimant's Motion to Remand be granted and the action be remanded to the Commissioner to properly perform the phase II and III analyses of step 4.

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  **A party must file any objections with the Clerk of the District Court within the ten-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.**

_____

UNITED STATES MAGISTRATE JUDGE